UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-cv-21808-SCOLA

ALL BRIGHT SANITATION
OF COLORADO, INC.,

    Plaintiff,

vs.

U.S. CITIZENSHIP AND
IMMIGRATION SERVICES,

    Defendant.
_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before the Court upon the Plaintiff's Motion for Summary Judgment [ECF No. 23], filed by All Bright Sanitation of Colorado, Inc. ("All Bright"), and the Defendant's Cross-Motion for Summary Judgment [ECF No. 24], filed by United States Citizenship and Immigration Services (the "Agency"). For the reasons explained below, Plaintiff's Motion is granted in part, while Defendant's Cross-Motion is denied. The Court vacates the Agency's decision and remands this matter for further consideration, consistent with this Order.

### Introduction

In this case, All Bright seeks a determination under the Administrative Procedure Act ("APA"), 5 U.S.C. §706 *et seq.*, that the Government improperly denied its petition for a foreign national to receive United States Non-Immigrant Investor Status pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(E), and certain Federal Regulations, 8 CFR §214.2(e). All Bright requested that the Agency change the nonimmigrant visa status of its sole owner and shareholder, Simon Geisler, to "E-2 Treaty Investor" from "F-1 Student," the visa classification Geisler previously enjoyed. The Agency denied All Bright's application principally because it found Geisler, the treaty investor, had not satisfied the requirements of an "investment" under 8 C.F.R. § 214.2(e)(12). The question before the Court is whether the Agency properly determined that Geisler was not eligible for the "E-2 Treaty Investor" classification.

**Background**[1]

### A. Requirements For Treaty Investor Status

The "E-2 Treaty Investor" visa classification was established by Congress in order to encourage capital inflow by foreign investors and to create additional employment opportunities for United States citizens. A treaty investor is someone admitted to the United States "solely to develop and direct the operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital." 8 U.S.C. § 1101(a)(15)(e)(ii). The governing requirements for obtaining this visa classification are set forth in 8 U.S.C. § 1101(a)(15)(e)(ii), and the implementing regulations, 8 C.F.R. § 214.2(e)(12) and 22 C.F.R. § 41.51, as well as in the U.S. Department of State Foreign Affairs Manual.

Of relevance here, the regulations require the treaty investor to have made an "investment," which is defined as:

> [T]he treaty investor's placing of capital, including funds and other assets (which have not been obtained, directly or indirectly, through criminal activity), at risk in the commercial sense with the objective of generating a profit. ***The treaty investor must be in possession of and have control over the capital invested or being invested.*** The capital must be subject to partial or total loss if investment fortunes reverse. ***Such investment capital must be the investor's unsecured personal business capital or capital secured by personal assets.*** Capital in the process of being invested or that has been invested must be irrevocably committed to the enterprise. . . .

*See* 8 C.F.R. § 214.2(e)(12) (emphasis supplied); *see also* 22 C.F.R. § 41.51(b)(7).

So long as the funds or assets are received by legitimate means and are in the treaty investor's possession and control, they may qualify as an "investment," even if received as a gift. *See, e.g.*, 9 FAM 41.51 N8.1-1. The value of equipment invested into the treaty enterprise may also be counted towards an "investment." *See, e.g.*, 9 FAM 41.51 N8.2-2. Likewise, loans may qualify, but not if they are secured with the assets of the treaty enterprise:

> Loans secured by the assets of the investment enterprise, such as mortgage debt or commercial loans, may not be used to meet the investment requirement. On the other hand, acceptable investment funds include such personal assets as a second mortgage on a home, unsecured or unencumbered loans or assets, and loans on the alien's personal signature.

*See* 62 Fed. Reg. 48138-01 (Sept. 12, 1997); *see also* 9 FAM 41.51 N8.1-2.

---

[1] The material facts in this case are not in dispute, as both parties concede. The Court draws the above factual and procedural background from the administrative record and the parties' summary judgment papers.

### B. Geisler's Request For Treaty Investor Status

On September 30, 2009, All Bright filed its petition seeking to qualify Geisler, a citizen of Austria, as an "E-2 Treaty Investor." Geisler formed and incorporated All Bright, a Colorado corporation of which he is the sole owner and shareholder. The application indicated that Geisler, through All Bright, had invested a total of $653,329 in order to purchase an existing garbage collection business, Canyon Waste & Recycling, Inc. ("Canyon"). The claimed investment was comprised of $226,690 in equipment, $375,000 in loans, and the rest in cash. The cash had allegedly been given to Geisler by his father, who owned and operated another waste management company in North Carolina. Geisler's father had also gifted the garbage collection equipment, for $1, directly to All Bright. There were two loans: one from Canyon's owners to All Bright for $175,000; and another from LEAF Funding, Inc., a third party lender, to All Bright for $200,750. Although there was no collateral on the $175,000 loan, Geisler signed a personal guaranty for payment. The garbage collection equipment, gifted by Geisler's father, was pledged as collateral on the $200,750 loan. That loan was also backed by a personal guaranty from Geisler.

### C. The Agency's Decision

The Agency denied All Bright's petition on March 15, 2010, finding that it failed to establish the necessary statutory and regulatory requirements for Geisler to receive the "E-2 Treaty Investor" visa classification. Thereafter, All Bright filed a motion to reopen, which the Agency denied on May 5, 2010, leaving the earlier decision undisturbed.

On June 2, 2010, All Bright filed a Complaint in this Court, challenging the Agency's decision under the APA. Subsequently, on July 31, 2010, the parties informed the Court that the Agency had agreed to receive further evidence from All Bright in support of its petition. The Court therefore administratively closed the case on August 5, 2010, to allow the Agency sufficient time to consider any new evidence. On August 11, 2010, the Agency vacated its previous decision and granted All Bright's motion to reopen.

On January 7, 2011, after All Bright submitted additional information, the Agency issued a new decision that again denied All Bright's petition. According to the Agency, All Bright failed to show that the capital invested in the treaty enterprise met all of the requirements for an "investment" under 8 U.S.C. § 1101(a)(15)(ii) and 8 C.F.R. § 214.2(e)(12). The Agency found that Geisler failed to show he was "in possession of and ha[d] control over the capital invested or being invested," as required by the regulations. *See* 8 C.F.R. § 214.2(e)(12). The Agency

explained that the record showed the equipment, worth $248,689, had been transferred directly from Geisler's father to All Bright in exchange for $1, but that the equipment was never in the "possession" or "control" of Geisler himself. It reached this conclusion notwithstanding that Geisler was the sole owner and shareholder of All Bright, because corporations are legal entities separate from their principals and shareholders.

In addition, the Agency found that All Bright's loans could not be counted because Gaiesler was not personally and primarily liable on either of them. *See* 8 C.F.R. § 214.2(e)(12) ("investment" must consist of "unsecured personal business capital or capital secured by personal assets"). The Agency concluded that the $200,750 loan did not qualify for "investment" treatment because the loan was secured with All Bright's assets, namely the equipment that Geisler's father had gifted to the corporation. The Agency also did not count the $175,000 loan because it was made without collateral. With respect to the cash, the Agency recognized that there was evidence Geisler's father had given money to his son, but found no documentation demonstrating that Geisler invested such funds into All Bright.

On February 8, 2011, All Bright filed a motion to reconsider the January 7, 2011 decision. The Agency denied that request on April 19, 2011, finding that All Bright failed to establish the decision was based on an incorrect application of law or policy. The Agency reiterated that All Bright had not shown that the capital at issue met the requirements for an "investment," as defined by 8 C.F.R. § 214.2(e)(12).

## **Jurisdiction**

This Court has jurisdiction to review the Agency's denial of an "E-2 Treaty Investor" petition under the APA, 5 U.S.C. § 706, and the federal question statute, 28 U.S.C. § 1331.[2]

---

[2] Although the Agency does not raise the issue, this Court has an independent obligation to satisfy itself of its own subject matter jurisdiction. *See Mirage Resorts, Inc. v. Quiet Nacelle Corp.*, 206 F.3d 1398, 1400-01 (11th Cir. 2000). There is a strong presumption favoring judicial review of administrative action that applies especially "to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction." *See Kucana v. Holder*, 130 S. Ct. 827, 839 (2010). Congress, in 8 U.S.C. § 1252(a)(2)(B), stripped the federal courts of the power to review certain discretionary immigration decisions, but this Court is unaware of any authority, from the Eleventh Circuit or elsewhere, applying that provision to the Agency's denial of a treaty investor status petition. Nor has the Agency argued that section 1252(a)(2)(B) applies here. The Court therefore does not find the provision applicable to this case. *See Beyond Mgmt., Inc. v. Holder*, 778 F. Supp. 2d 1375, 1379 (N.D. Ga 2011) (section 1252(a)(2)(B) did not strip district court of jurisdiction to review denial of I-129 petition).

## **Legal Standards**

This case requires the Court to apply an amalgamation of legal standards informed by the summary judgment rule, the standard of review under the APA, and the deference accorded administrative agency action.

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. North Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). Here, as the parties agree, the material facts are not in dispute and the Court's review is limited to the administrative record before the agency. Thus, this case is suited for summary disposition under Rule 56. *See Mahon v. U.S. Dep't of Agric.*, 485 F.3d 1247, 1253 (11th Cir. 2007) ("Summary Judgment is particularly appropriate in cases in which a district court is asked to review a decision rendered by a federal administrative agency."); *Fla Fruit & Veg. Ass'n v. Brock*, 771 F.2d 1455, 1459 (11th Cir. 1985) ("The summary judgment procedure is particularly appropriate in cases in which the court is asked to review . . . a decision of a federal administrative agency," especially where "the court considers the record that was before the agency"); *see also Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985) ("summary judgment is an appropriate mechanism" for the district court "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did").

### B. APA Standard Of Review

When reviewing agency action under the APA, the district court must determine whether the agency's decision was arbitrary, capricious, or an abuse of discretion. *See Mathews v. USCIS*, 458 F. App'x 831, 833 (11th Cir. 2012). This standard "provides the reviewing court with very limited discretion to reverse an agency decision, and is exceedingly deferential," especially "in the field of immigration." *See id.* (citations omitted). The relevant inquiry is "whether an agency's decision was based on consideration of the relevant factors and whether there has been a clear error of judgment." *See Mahon*, 485 F.3d at 1253 (citation omitted).

Review is limited to the material before the agency – that is, the administrative record. *See Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996). "[A] court does not consider any evidence that was not in the record before the agency at the time that it made the decision or promulgated the regulation," *see*

*United States v. Guthrie*, 50 F.3d 936, 944 (11th Cir. 1995), because "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court," *see Fla Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). In making its decision, "[t]he agency is not required to discuss every piece of evidence, so long as it gives reasoned consideration to the evidence submitted." *Xunbing Liu v. U.S. Attorney Gen.*, 440 F. App'x 718, 719 (11th Cir. 2011).

The Eleventh Circuit has held that "an agency fails to give reasoned consideration to the record evidence when it misstates the contents of the record, fails to adequately explain any illogical conclusions, or provides justifications for its decision which are unreasonable or do not respond to any arguments in the record." *See id.* "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Lorion*, 470 U.S. at 744.

### C.  Deference To Agency Action

Since 1984, the Supreme Court has accorded high deference, commonly called *Chevron* deference, wherever it appears Congress generally delegated authority to an agency to make rules carrying "the force of law," and the agency's interpretation claiming deference is promulgated in the exercise of that authority. *See Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see also Astrue v. Capato*, 132 S. Ct. 2021, 2033-34 (2012) (discussing *Chevron* deference). This deference is at its apex when an agency engages in notice-and-comment rulemaking or formal, adjudicative decisionmaking. *See United States v. Mead Corp.*, 533 U.S. 218, 230 (2001).

Yet, not all types of agency action are entitled to this high degree of deference. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) ("*Chevron* deference . . . is not accorded merely because the statute is ambiguous and an administrative official is involved."). The appropriate level of deference depends upon the type of agency action at issue, and the procedure utilized by the agency to arrive at its conclusions. *See Mead Corp.*, 533 U.S. at 227-30; *Christensen v. Harris Cnty.*, 529 U.S. 576, 58 (2000). As noted above, *Chevron* deference typically applies only when an agency's decision is the product of a formal agency process, such as notice-and-comment rulemaking, or where the decision is formal and has precedential value beyond the facts and parties to a particular case. *See Mead Corp.*, 533 U.S. at 230, 232.

In *Mead*, the Supreme Court addressed the level of deference owed to tariff classification rulings issued by the United States Customs Service. The Court held that the rulings were not entitled to *Chevron* deference because:

> Customs does not generally engage in notice-and-comment rulemaking when issuing them, and their treatment by the agency makes clear that a letter's binding character as a ruling stops short of third parties; Customs has regarded a classification as conclusive only as between itself and the importer to whom it was issued[.]

*See id.* at 233 (citations omitted). The Supreme Court also relied upon the fact that many thousands of the letter rulings were issued each year, by 46 different Customs offices throughout the Country. *See id.* at 233-34 ("Any suggestion that rulings intended to have the force of law are being churned out at a rate of 10,000 a year at an agency's 46 scattered offices is simply self-refuting."). The Court therefore concluded that "[tariff] classification rulings are best treated like interpretations contained in policy statements, agency manuals, and enforcement guidelines. They are beyond the *Chevron* pale." *See id.* at 234 (citations omitted).

Rulings of this kind, and the agency interpretations therein, are "entitled to respect" only to the extent they have the "power to persuade." *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Mead Corp.*, 533 U.S. at 235 (tariff classification ruling may "at least" qualify for "respect proportional to its 'power to persuade'"). As Justice Jackson explained long ago:

> The weight [given to] such [an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*See Skidmore*, 323 U.S. at 140; *see also Mead Corp.*, 533 U.S. at 235 (under *Skidmore*, an agency's decision "may [at least] claim the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight").

Since *Mead*, the Eleventh Circuit has applied these principles in the context relevant here – agency decisionmaking in the field of immigration. In *Quinchia v. U.S. Attorney General*, 552 F.3d 1255, 1259 (11th Cir. 2008), for example, the Court of Appeals refused to accord *Chevron* deference to decisions of the Board of Immigration Appeals that are issued by a single member, do not rely upon existing agency or federal court precedent, and are themselves not precedential. In addition, and particularly relevant here, at least one district court has also considered what level of deference applies to a written denial of a petition for change in nonimmigrant status – which is precisely the situation in this case. *See Youssefi v. Renaud*, 794

F. Supp. 2d 585 (D. Md. 2011).  In *Youssefi*, the court found "[t]he agency's review of Plaintiff's change-of-status application did not involve notice-and-comment procedures or the trial-type procedures that are characteristic of formal agency adjudication," and therefore "the agency's interpretation [should be accorded only] the low level of deference that is given to the informal interpretive decisions of low-level agency officials."  *See id.* at 592.

Consistent with these decisions, the Court finds that the Agency's denial of Geisler's application is not deserving of high deference.  The decision is geared only to the facts presented, does not purport to bind parties beyond All Bright and Geisler, and does not rely upon prior decisions or interpretations of the regulations at issue on the key points of decision.  The decision was issued and signed by the Director of the Agency's California Service Center, a government bureaucrat; it does not come from an adjudicative arm of the Agency and does not bear any indicia of formal agency rulemaking or adjudication.  *See Mead Corp.*, 533 U.S. at 235; *see also Youssefi*, 794 F. Supp. 2d at 592.  Plainly, this is not the sort of administrative action designed to carry "the force of law."  *See id.* at 229.  Instead, the Agency's decision merits only *Skidmore* deference and, thus, must be evaluated based upon its overarching "power to persuade," considered in light of "its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight" that may apply.  *Mead Corp.*, 533 U.S. at 235.

## Legal Analysis

The Agency denied the "E-2 Treaty Investor" petition in this case principally because All Bright failed to demonstrate that Geisler had "possession" and "control" of the investment capital put into the treaty enterprise.  The Agency also concluded that the loans could not be counted because they were not secured by Geisler's personal assets.  The Court finds that the Agency's decision was arbitrary and capricious and an abuse of discretion on several levels, as explained below.  Therefore, the decision must be vacated and remanded for further consideration.

### A. The Garbage Collection Equipment:  Did Geisler "Possess" And "Control" It?

In the January 2011 decision, the Agency found that the garbage collection equipment did not count as an "investment" because it was not in Geisler's "possession" and "control."  *See* Jan. 7, 2011 Decision at 3-5.  The Agency reached that conclusion because Geisler's father gifted $248,689 in equipment directly to All Bright, not to Geisler.  The Agency rejected the argument that Geisler's 100% ownership of All Bright made any difference, noting "a corporation and its

shareholder are considered two separate entities 'apart and distinct' from each other[.]" *See id.* at 4. In the April 2011 reconsideration decision, the Agency further emphasized this point:

> Regulations governing what constitute a proper 'investment' specifically state that the treaty investor must be in possession of and have control over the capital invested or being invested. In this case, although [Geisler] may own 100% of the corporation, a corporation and its shareholder are considered two separate entities. A corporation's property cannot be seen as owned or in the possession of the single shareholder regardless of whether he or she is a single shareholder.

*See* Apr. 19, 2011 Decision at 2-3.

The Court holds that the Agency acted arbitrary and capriciously, and abused its discretion, in finding Geisler did not have "possession" and "control" over the equipment in question. The regulation at issue does not define what it means to "possess" and "control" the assets under investment. Nor does the Agency identify (either in the decisions under review or in its summary judgment papers) any precedent interpreting the words, or any other authoritative agency position discussing their meaning.[3]

In the absence of any definition in the regulations or any controlling agency interpretation, the Court must judge the persuasiveness of the Agency's decision by reference to the ordinary meaning of the words employed. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008) (where "there is no statutory or administrative definition of [the word in question], we look to its ordinary, everyday meaning"); *Molloy v. Allied Van Lines, Inc.*, 267 F. Supp. 2d 1246, 1252 (M.D. Fla. 2003) ("Undefined terms used in the regulations are given their ordinary practical meaning.").

---

[3] Generally speaking, an agency is entitled to "substantial deference" in interpreting its own regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). Where "'the meaning of [regulatory] language is not free from doubt,' the reviewing court should give effect to the agency's interpretation so long as it is 'reasonable,'" – meaning, "so long as the interpretation 'sensibly conforms to the purpose and wording of the regulations." *Martin v. Occup'l Safety & Health Review Comm'n*, 499 U.S. 144, 150-51 (1991) (citations omitted). In its summary judgment papers, the Agency advocates for deference under this rule, but has not identified or cited any authoritative agency interpretation, position, or construction of the words "possession" and "control," as used in the regulation. The federal courts "have never applied [deference] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice." *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency [orders]"). Even if the rule of deference applied, the Agency's construction of the terms would still not pass muster because, as discussed *infra*, it is contrary to the plain meaning of the words. *Cf. Thomas Jefferson Univ.*, 512 U.S. at 512 (agency's interpretation will generally control "unless an 'alternative reading is compelled by the regulation's plain language'") (citations omitted).

"In order to determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001). According to Merriam-Webster's Dictionary, the term "possession" means "the act of having or taking into control," or "ownership," or "control or occupancy of property without regard to ownership." *See* Merriam-Webster.com, http://www.merriam-webster.com/dictionary/ possession (last visited Sept. 6, 2012). Thus, while "possession" may connote actual ownership, its meaning is broader – it may also mean "control or occupancy of property ***without regard to ownership***." *See id.* (emphasis supplied). Resort to Black's Law Dictionary confirms this understanding: "possession" may refer to "[s]omething that a person owns or controls," but it may also mean "[t]he fact of having or holding property in one's power; the exercise of dominion over property," or "[t]he right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object." *See* Black's Law Dictionary 1281 (9th ed. 2009). Thus, "[a]lthough the two terms are often confused, possession is not the same as ownership." *See* West's Encyclopedia of American Law (2d ed. 2008), *available at:* http://legal-dictionary.thefreedictionary.com/possession (last visited Sept. 6, 2012).

Nor does "control" mean, exclusively, title and ownership. The ordinary meaning of that term is "to exercise restraining or directing influence over," or "to have power over." *See* Merriam-Webster.com, http://www.merriam-webster.com/dictionary/control (last visited Sept. 6, 2012). It is synonymous with "regulate" and "rule," but not necessarily with title or ownership. *See id.* In the legal sense, "control" may refer to "[t]he direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise," as well as "the power or authority to manage, direct, or oversee." Black's Law Dictionary 378 (9th Ed. 2009). It would seem, therefore, to encompass the situation we confront here – a corporate officer and shareholder's power to govern corporate property and affairs.

Yet in this case, rather than employing the plain meaning of the terms "possession" and "control," the Agency proceeded as though the words absolutely required actual title and ownership. That is, the Agency found Geisler ineligible for treaty investor status simply because All Bright, rather than he, had ownership and title to the garbage collection equipment. But the regulation requires "possession" and "control" over the assets; it does not say anything about "title" or "ownership." That those terms could have been written into the regulation, but were

not, is strong indication that the Agency, in promulgating it, did not mean to impose a requirement of title or ownership.  *See Lee v. Flightsafety Servs. Corp.*, 20 F.3d 428, 433 (11th Cir. 1994) ("A court should presume regulations mean what they say.  If the executive branch wishes to reconsider them, it is free to do so."); *cf. Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *see also Clark Reg'l Med. Ctr. v. Shalala*, 136 F. Supp. 2d 667, 676, 677 (E.D. Ky. 2001) ("The defendant's proposed construction tortures the plain language of the regulation.  The regulation does not say [the words advocated].  . . . [I]f the defendant intended the regulation to simply mean [those words], it could have directly and easily said so, but it did not.").

The fact of All Bright's ownership and title does not exclude the possibility that Geisler nonetheless "possessed" and "controlled" the equipment, given his position as 100% owner and sole shareholder of All Bright.  The Agency's only rationale for discounting Geisler's position is that "a corporation and its shareholder are considered two separate entities," and "[a] corporation's property cannot be seen as owned or in the possession of the single shareholder regardless of whether he or she is a single shareholder."  *See* Apr. 19, 2011 Decision at 2-3.

Such reasoning fails to persuade.  Although a corporation and its sole shareholder are legally distinct, it does not follow that the shareholder, for that reason, fails to have "possession" and "control" over corporate assets and property.  In fact, in this case, it appears that just the opposite is true.  Indeed, All Bright contends that its equipment was at all times under the direct dominion of Geisler, who held the keys to it and who, as sole company shareholder, pledged it as collateral for a corporate loan.  The Agency ignores these facts and, instead, insists that only All Albright "possessed" and "controlled" the equipment.  The Agency's conclusion, though, is contrary to the "axiomatic" principle that "a corporation . . . cannot act other than through its officers, employees, and agents."  *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009); *see also Coryell v. Phipps*, 317 U.S. 406, 410 (1943) ("A corporation necessarily acts through human beings.").  In other words, it fails to acknowledge that corporate property must always be "possessed" and "controlled" by some person; the corporation itself, a fictitious entity, cannot do so on its own.  Accordingly, the Agency's point that a corporation is legally separate from its shareholders does not exclude the possibility that Geisler nonetheless had "possession" and "control" over the equipment.

Indeed, the Agency seems to recognize this fact in stating that "[Geisler], as the only 'owner' of the treaty enterprise, has the absolute power to 'direct the use of the equipment, repair it, sell it for cash, donate it to charity, or even discard it into a landfill[.]'" *See* Jan. 11, 2011 Decision at 5. Yet, the Agency goes on to use this against Geisler because the equipment was pledged as collateral on the $200,750 loan:

> [Geisler] may not sell, donate, or discard the equipment or assets used as collateral for a loan. In essence, the equipment belongs to Leaf Funding, Inc., until the treaty enterprise pays its $200,000 [sic] loan. Accordingly, [Geisler] has never 'possessed' or 'controlled' the equipment.

*See id.*

But to acknowledge that the equipment was pledged as collateral also ultimately requires the acknowledgement that Geisler "possessed" and "controlled" the equipment in the first place, because only through Geisler – as sole owner of All Bright – was the equipment able to be pledged. Put differently, if the equipment had not been in Geisler's "possession" and "control," as those terms are understood in their ordinary sense, then it never could have been pledged on the loan. No one else could have pledged it because no one else owns, runs, or holds stock in All Bright.

The Agency turns all of this on its head. Geisler's act of pledging the equipment as collateral, as All Bright's owner and sole shareholder, cannot serve as proof that he does not currently "possess" or "control" the equipment, and simultaneously as proof that he never "possessed" or "controlled" it in the first place. The Agency cannot have it both ways. Either he had "possession" and "control" of the equipment and, therefore, the ability to pledge it as collateral, or he did not.

Moreover, just because the equipment was pledged as collateral on a loan does not necessarily mean that Geisler no longer "possesses" or "controls" it now. The Agency offers no explanation for this logical leap, beyond the conclusory remark that "[i]n essence, the equipment belongs to Leaf Funding, Inc.," until the loan is repaid. *See id.* This finding appears to once again rest on the faulty assumption that "possession" and "control" are somehow synonymous with principles of title and ownership. But when something is pledged as collateral, it does not automatically become the property of the lienholder, nor does it necessarily fall into the lienholder's "possession" and "control." Indeed, "[t]ypically, the creditor does not take possession of the property on which the lien has been obtained." *See* Black's Law Dictionary 1006 (9th ed. 2009). Only in the event of default does that happen. *See* Leaf Loan Agreement

[ECF No. 19-4, p. 42] at ¶ 5 ("Upon the occurrence of any Event of Default, Lender may . . . require Borrower to assemble all Collateral," and "remove any physical obstructions for removal of the Collateral from the place where [it] is located and [may] take possession of any or all items of Collateral"). The Agency's construction not only ignores the plain meaning of "possession" and "control," but also evinces a mistaken understanding of a lienholder's rights in collateral. *See, e.g.*, *Garavito v. U.S. I.N.S.*, 901 F.2d 173, 174 (1st Cir. 1990) (Breyer, J.) (agency abused its discretion in denying treaty investor status because "one important reason that [it] gave for denying the visa change rest[ed] upon an obviously false factual premise");

In short, the Agency has not cited any regulation, decision, or case law holding that the person seeking treaty investor status must hold legal title to the assets at issue in order to be deemed in "possession" and "control" of them. The Agency's decision, moreover, is thin on reasoning – a fact that further undercuts its persuasiveness and the deference owed to it. *See Mead Corp.*, 533 U.S. at 235 (under *Skidmore*, agency decisionmaking is evaluated for its "power to persuade" in light of "its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight"). The decision provides no explanation for its conclusions, but instead just repeats, over and over, the same conclusory finding that Geisler failed to show he was in "possession" and "control" of the equipment at issue. But saying something again and again does not make it so. The Agency's failure to acknowledge or give reasoned consideration to the matters above constitutes an abuse of discretion, and renders its decisionmaking arbitrary and capricious. The Agency's interpretation is at war with the plain language of the regulation and, therefore, must be reconsidered.

### B. The Loans:  Were They Secured By Geisler's Personal Assets?

In the January 2011 decision, the Agency concluded that neither the $200,750 loan with Canyon, nor the $175,000 loan with Canyon's former owners, could be counted as an "investment" because neither was secured by Geisler's personal assets. *See* Jan. 11, 2011 Decision at 5. The $200,750 loan did not count, the Agency found, because All Bright's equipment was pledged as collateral. *See id.* As the Agency explained, "commercial loans secured by the assets of the enterprise cannot count toward the investment, as there is no requisite element of risk." *See id.* As for the $175,000 loan, the Agency found it did not qualify because "this loan was made without collateral." *See id.*

These conclusions cannot be sustained because they do not take into account that Geisler signed personal guarantees on both loans. *See Xunbing Liu*, 440 F. App'x at 719 ("agency fails

to give reasoned consideration to the record evidence when it misstates the contents of the record, fails to adequately explain any illogical conclusions, or provides justifications for its decision which are unreasonable or do not respond to any arguments in the record"); *see also Dong In Chung v. U.S. I.N.S.*, 662 F. Supp. 474, 476 (W.D. Wash. 1987) (agency abused its discretion in denying treaty investor status by not expressly considering certain evidence and explaining what impact, if any, it had on applicant's request).

The Agency simply dismisses the $200,750 loan as ineligible for consideration because the equipment gifted to All Bright was used as collateral, without analyzing in any way the implications of Geisler's personal guaranty.[4]  Likewise, the Agency baldly concludes that the $175,000 loan does not qualify because no collateral was pledged, without any discussion of Geisler's personal guaranty.  These analytic failures by the Agency draw into question the conclusion that "there is no element of risk" for Geisler here.  *See* Jan. 11, 2011 Decision at 5.  In failing to give reasoned consideration to Geisler's personal guarantees, the Agency abused its discretion and acted arbitrarily and capriciously.

### C.  The "Real" Investor: Was It Geisler or His Father?

In its summary judgment papers, the Agency contends that the only person who did any real investing is Geisler's father.  *See, e.g.*, Agency's Resp. [ECF No. 26] at 4 ("the record establishes that the *only* person who possessed and controlled the capital before it was invested into All Bright was Simon Geisler's father").  Therefore, according to the Agency, Geisler is merely a "front" for someone else's investment and is not personally eligible for treaty investor status.  *See id.* at 5, 8 (fact that "*George Geisler*, Simon Geisler's father, sold the equipment *directly* to All Bright, underscores the fact that Simon Geisler did not invest his *own* personal capital into All Bright").

---

[4] The significance of Geisler's personal guaranty on the $200,750 loan vis-à-vis the equipment as collateral is an issue best suited for the Agency on remand.  The Court expresses no opinion on the matter, other than to note that Geisler may conceivably bear personal risk, even though the company's equipment was pledged as collateral.  The equipment is, of course, a depreciating asset – everyday it is worth less than the day before, and with time it will inevitably be damaged or destroyed to the point of uselessness.  Were All Bright to default on the loan, it is conceivable that the equipment may not be sufficient to satisfy the outstanding balance on the loan.  Under such circumstances, Geisler may be liable for the remaining balance as a consequence of signing the personal guaranty.

This argument fails to persuade because it ignores that Geisler, on behalf of All Bright, also entered into an agreement to buy Canyon separate and apart from his father's contributions to All Bright. The Agency's position conflates the investment made in All Bright with the investment made in Canyon. Geisler formed All Bright, and his father gifted the equipment to that enterprise. Thereafter, Canyon was purchased. Thus, there are two separate aspects to the investment here. The Agency cannot focus myopically on Geisler's father's contributions to All Bright, while ignoring that the purchase of Canyon was a separate aspect of the investment.

The Agency's argument that Geisler was a mere "front" for his father's investment is also unpersuasive because the regulations permit gifts to be counted towards an investment, so long as the gifts come from a legitimate source and are in the "possession" and "control" of the treaty investor. Thus, the fact that the equipment originated with Geisler's father (thereby arguably making him a "front" for the investment) would appear irrelevant, if the equipment was thereafter "possessed" and "controlled" by Geisler and used in his investment with Canyon.

In this regard, the Agency's reliance on *Nice v. Turnage*, 752 F.2d 431 (9th Cir. 1985), is misplaced. There, the concern was where the funds had originated, not whether the investor "possessed" and "controlled" them. *See id.* at 432 (noting "several irregularities surrounding the [investment]" and uncertainty as to its source). That is not an issue here. The Agency does not, in its decision, question the source or legitimacy of Geisler's assets; it only finds that they were not in his "possession" and "control" – a determination that the Court has found arbitrary and capricious, for the reasons discussed above.

## Conclusion

For the reasons explained above, the Agency's determination that Geisler did not have "possession" and "control" over certain of the assets under investment constitutes an abuse of discretion and is arbitrary and capricious. So, too, is the Agency's finding that Geisler had nothing at risk with respect to the two loans. While these are serious deficiencies, one point must be stressed: the significance of the problems discussed herein to the ultimate outcome of this case is not for this Court to decide. The Agency is in the best position to apply its regulations to the facts, and the Court does not intend to interfere with that task. The Court therefore expresses no opinion on the proper disposition of All Bright's petition on remand. The Court simply holds that the Agency's decision does not pass muster under the relevant legal standards and, as such, must be set aside. The Agency must issue a new decision on All Bright's petition consistent with this Order.

Accordingly, it is hereby **ORDERED and ADJUDGED** that All Bright's Motion for Summary Judgment is **GRANTED IN PART**, and the Agency's Cross-Motion for Summary Judgment is **DENIED**. The Agency's decision is **VACATED** and this matter **REMANDED** for further consideration consistent with this Order. The Clerk is directed to **CLOSE** this case.

**DONE and ORDERED** in chambers, at Miami, Florida on September 11, 2012.

_____
**ROBERT N. SCOLA, JR.
UNITED STATES DISTRICT JUDGE**

Copies to:
*Counsel of record*